Lashawn Jermaine Johnson
# 41481-048
FCI MENDOTA
POBX 9
MENDOTA, CA. 93640
No Telephone/Fax available.

Petitioner/Defendant, pro se.

### UNITED STATES DISTRICT COURT

### DISTRICT OF MONTANA

### BILLINGS DIVISION

---

UNITED STATES of AMERICA,

    Respondent/Plaintiff,

v.                                          Civil Case No:

LASHAWN JERMAINE JOHNSON,                   Criminal Case No: CR-06-079-BLG-JDS

    Petitioner/Defendant.

PETITIONER'S SUPPLEMENTAL BRIEF AND MEMORANDUM OF
LAW IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR
CORRECT A SENTENCE PURSUANT TO TITLE 28 USC §2255.

---

PETITIONER, LASHAWN JERMAINE JOHNSON, PRO SE; respectfully submits his
supplemental brief and memorandum of law in support of his motion to vacate,
set aside, or correct his sentence pursuant to Title 28 USC §2255.  Petitioner
requests consideration of this and future supplemental briefs and memorandums
of law (pursuant to the Court's briefing schedule), the case files and records,
and any other evidence this Honorable Court may so require.

              Respectfully submitted,

              07/08/2013

              Lashawn Jermaine Johnson
              Petitioner, pro se.

( 1 )

I.      JURISDICTION:

This Honorable Court is the district with original jurisdiction
in the instant matter. Pursuant to the provisions of Title 28 USC§ 2255
this is the court with jursdiction to hear the Petitioner's motion under
§2255 which states in part"

"(a) prisoner in custody under sentence of a court established by
act of Congress claiming the right to be released upon the ground that the
sentence was imposed in violation of the Constitution or laws of the United
States, or that the court was without jurisdiction to impose such sentence,
or the sentence was in excess of the maximum authorized by law, or is
otherwise subject to collateral attack, may move the court which imposed
the sentence to vacate, set aside or correct the sentence."

This Honorable Court imposed the sentence under attack and has
authority and jurisdiction to hear the issues and grant relief as warranted.

II.     PROCEDURAL BACKGROUND OF THE CASE:

Petitioner was indicted for eight criminal charges relating to
narcotics violations and a ninth criminal forfeiture charge. Petitioner
proceeded to jury trial and following a three day trial was found guilty
of Count (1) 21 USC § 846, Counts (2) and (3) 'possession with intent to
distribute' 21 USC § 841, Count (7) 'possession with intent to distribute'
21 USC § 841, and Count (8) violation of 18 USC § 924(c). Count 9 is unre-
lated to the instant motion.

Sentence was imposed on March 21, 2007 to a term of incarceration of
360 months on Counts 1,2 and 3 to  run concurrently; 240 months on Count 7
to run concurrently; and 60 months on Count 8 to run consecutive to all
other Counts.

Petitioner moved to direct appeal based solely on sentencing issues
and was remanded and resentenced on January 27, 2010 to a term of 293 months
on Counts 1 thru 3; 240 months on Count 7 to run concurrent and 60 months
on Count 8 to run consecutive. Petitioners second direct appeal was denied
on July 19, 2011; counsel refused to petition for writ of certiorari. On
(2)

November 1, 2011, Petitioner filed a motion for reduction of sentence to 18 U.S.C. § 3582 (c)(2) based on the Fair Sentencing Act. On Feburary 13, 2012 Petitioners sentence was reduced to 235 months on Counts 1 thru 8 all to run concurrent. Petitioner appealed the Courts ruling.

While appeal was pending, on June 14, 2012, Petitioner filed his Motion to Vacate under 28 U.S.C. § 2255. On September 4, 2012, petitioners motion to vacate was denied as pre-mature due to the pending direct appeal of his 3582(c)(2) motion and notified him that he had one year from the date that his direct appeal became final.

On September 24, 2012, Petitioners appeal was affirmed. This motion is timely filed.

III.   ISSUE ONE:

PETITIONER WAS DENIED REASONABLE ACCESS TO DISCOVERY CREATING A
CONSTITUTIONAL VIOLATION OF DUE PROCESS AND THE RIGHT TO CONFRONTATION.

Government counsel in the instant action provided defense counsel with
approximately 3000 plus pages of discovery materials.  The government rendered
this release void when it attached two conditions upon the defense that prevented
the Petitioner from the ability to properly review the documents: (1) the
government insisted on a provision that the Defendant/Petitioner would not be
permitted to retain the discovery, and (2) Defendant/Petitioner was removed from
geographical proximity to his defense counsel and housed at "Wolf's Point", a
facility 300 miles from Billings, MT and the location of his counsel and the
Court.  These tactical moves were initiated to give government counsel a distinct
advantage at trial and were effective in doing so as evidenced by the defense
presentation, or rather lack of defense presentation at trial.

Defense counsel Jack E. Sands, of Billings, Montana, moved the Court to
address the discovery limitations and to move Petitioner back to Billings to
permit a meaningful preparation for trial. Dkt. # 19, October 19, 2006.  The
Court denied the motion at Dkt# 20 on October 20, 2006 and either by design or
oversight became a party to the constitutional denial.  The combination of the
discovery limitations and the unreasonable distance between counsel and defendant
created a situation that made it physically impossible for the defense to present
any meaningful confrontation to the government case in chief.  The physical aspect
of the denial can be readily seen if the Court had taken notice of the situation
in "real world" terms.

The following facts and mathematical aspects are taken with the advantage
being given to the government; more realistically, the physical impossibility
was even much more skewed against the Petitioner.  The review of the discovery
was impossible based on the following:

( 4 )

1.     Petitioner was given approximately 1000 pages of discovery during
his attorney's visit.  This would be picked up the next day and the next
batch of 1000 (plus) pages would be left for review.  This occurred three
times completing the review of **over 3000 pages of legal discovery.**

2.     "Assuming" that the Petitioner was prepared to read for 24 hours without
breaking for sleep or food, he would be reading 41.5 pages per hour, or
about **1.4 pages per minute.**

3.     Considering that an FBI "302" report is written single spaced in a
font of 12, then such a  routine report would contain approximately 300-400
words.  Using the low end of 300 a person would have to read and comprehend
420 words per minute.

This task was physically impossible, government counsel knew it would be impos-
sible,and the Court most certainly should have known that it would be impossible.
No person can read and comprehend 420 words per minute for 24 hours straight.
This is of course without taking into consideration that there would be no time
for note-taking or any meaningful comparison or review for contradictions in facts.

It must be accepted as irrefutable that the conditions imposed by government
counsel and accepted by the Court were unreasonable.  The next logical argument is
that defense counsel was ineffective for providing the discovery in such large
numbers.  If, and only if, Mr. Sands was ineffective in this regard it is a direct
result of the removal of his client to a remote location until immediately prior
to trial, thus necessitating the force-feeding of the discovery.

1.     PLACEMENT OF PETITIONER 300 MILES FROM BILLINGS WAS AN UNETHICAL
       TRIAL TACTIC THAT SEVERELY PREJUDICED THE PETITIONER.

Should the government argue or the Court rule that the force-feeding of
the discovery materials was a matter of ineffective representation it must be
seen that Mr. Sands was positioned for failure by the Court.  For example,

once again skewing the numbers to benefit the government, it must be clearly visible that expecting an attorney to travel 300 miles each way to visit his client is unreasonably time and resource consuming.  Three hundred miles by auto, driving a sane and legal speed, is six hours one way (non-stop).  This is the majority of a normal work day.  Then one must consider the time spent being processed into a correctional facility, carrying documents that must be x-rayed at the very minimum.  Another one to two hours expended.  Visit of up to one or two hours and this is already a ten hour day without any meal or restroom breaks.  How often could a privately retained counsel, one not on an unlimited government budget, continue such an ordeal?  It simply cannot be described as reasonable.  None of the factors above consider the return six hour trip or the possible alternative of a motel/hotel at considerable expense, once again, not on federal per diem.  Each trip is a full two day exercise, minimum.

The limitations on the discovery and the remote location of the Petitioner combined to create a "no win situation" for the defendant in a criminal trial.  What is most disturbing is that the rationale for these conditions were not merely false, they were intentionally deceptive to the Court.

2.    IMPOSING THESE CONDITIONS TO "PROTECT" THE INFORMANTS WAS A FRAUD.

The "classic" federal prosecutor reason for limiting discovery to the defendant is a claim of "protecting" the identities of confidential informants from being spread throughout the jails.  Using this ploy in the instant case is fraudulent and completely unnecessary based on the known facts.

First and foremost, there were never any "confidential informants" in the instant case.  Not one single person needed their identity concealed.  Each and every one of the "informants" were heavily documented **cooperating co-defendants** who knew they would be required to testify in open court in order to receive any chance at a sentence reduction.  See: Trial Transcript Nov. 28, 2006 page 366.

( 6 )

There is a world of difference between "confidential informants" and what are described as "cooperating codefendants". The vast majority of witnesses in this case are all experienced street level narcotics dealers or worse; this is of course with the exception of law enforcement agents, chemists and others who are completely unrelated to the criminal element. The local press clearly stated the full names, city of residence, and extent of charges in regards to these persons in the newspaper on numerous occasions. The star "informant" was an admitted prostitute, drug dealer and madame; it is unlikely that her identity required any fictitious protection. When these known facts are reviewed in an honest approach it is evident that the measures taken were purely for the tactical advantages government counsel reaped from the denials.

The restrictions on the release of discovery to the Petitioner and his remote placement from his counsel resulted in a constitutional denial of 'Due Process' and the constitutionally protected right to confrontation of the govern- ment case and the opportunity to assist in one's own defense.


LEGAL ANALYSIS:

The legal right to confrontation with the case presented against a defendant is found in the United States Constitution Amendment VI. This goes beyond the basics of physical confrontation with witnesses. Right of confrontation "...means more than being allowed to confront the witness physically," but rather "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Davis v Alaska 415 US 308,315 (1974). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v Craig 497 US 836,845 (1990). The Confrontation Clause " requires that a

( 7 )

defendant be given an opportunity for **effective** cross-examination." Murdoch
v. Castro 365 F 3d  699,704 (9th Cir 2004) (emphasis added by Petitioner).
A defendant's rights have been violated when his is "prohibited from engaging
in otherwise appropriate cross-examination...and thereby to expose the jury to
facts from which jurors...could appropriately draw inferences." Delaware v
Van Arsdall 475 US 673,680 (1986) (quoting Davis, 415 US at 318).  These legal
precedents lead us to the crux of the issue presented; the deceptive tactics of
government counsel to prevent the Petitioner reasonable access to discovery impeded
his preparation to aid in his defense,  and engage in **effective cross-examination**
of the government witnesses.

The critical aspect of trial preparation is undeniably in the steps taken
to effectively cross-examine the government's witnesses. This is when preparation
meets opportunity;  when an opposition witness states something his opponent knows
to be false or inaccurate, even deceptive.

The situation in the instant case created an unreasonable denial of the
right to confrontation which is readily apparent even to the untrained eye.
Petitioner was given no valid opportunity to fully review, digest and compare
documents in order to ascertain if there were inconsistencies or even better,
false statements,in the discovery documents.  The ability to detect inconsistent
statements or contradictory facts between various documents and in particular the
FBI '302's of witness and/or suspect statements is the very core of preparation
for **effective cross-examination,** which the true essence of the constitutional
right to confrontation.

The only possible remedy for such a constitutional denial is a reverse of
the instant conviction and a re-trial.

( 8 )

IV.     ISSUE TWO:

          THE UNDERCOVER BUYS OF APRIL 2005 ARE NOT CREDIBLE HAVING BEEN
          CONDUCTED CONTRARY TO THE MOST BASIC OF LAW ENFORCEMENT PROCEDURES
          AND MUST BE REJECTED AS ADMISSIBLE EVIDENCE.

     In preparation for this §2255 motion Petitioner has reviewed the case

files of other inmates charged with narcotics offenses and the written case

decisions in similar situations.  Petitioner has learned that there are very

strict standard operating procedures (SOP's) for undercover buys of narcotics.

The officer in the instant case either chose to violate those SOP's or he was

improperly trained in his professional endeavors in undercover narcotics buys.

The three "u/c buys" of April 2005 all have the same errors and none of the

evidence collected can be accepted as credible in a federal criminal case.

          1.   APRIL 12, 2005 - UNDERCOVER BUY OF EXHIBIT # 400.

     Per the transcripts of November 27, 2006 page 181 to 186, Officer Chartier

describes giving a 'confidential informant' money to go into an apartment com-

plex  to purchase crack cocaine from Heather Schutz.  No police officer kept

the "CI" in view during the alleged buy;  no one  could verify if the "CI" did

in fact actually go to the apartment of Schutz; and there are infinite other

possible scenarios in which the "CI" could have obtained narcotics from an

unknown/unidentified third party and then given the narcotics to Chartier.

     The "standard" procedures used by law enforcement to answer these unknowns

were not followed by Officer Chartier.  First of all an "informant" is subjected

to a complete search to determine that they do not have drugs on them to use as

a "plant";  next, they are relieved of all money to ensure that only the "buy

funds" are expended for the narcotics and that the "CI" does not purchase their

own drugs from the "target"; and most importantly, the "CI" is kept in constant

visual contact into and out of the suspected "drug location".  None of that was

testified to in the instant situation.  The use of a "bodywire" does not negate

( 9 )

any of this argument as "BODYWIRES" can be turned on and off or removed.   The lack of admission of the "bodywire transcripts" into evidence casts more doubt on the veracity of the described "buy".   This undercover "buy"/seizure lacks any base of credibility and should have been stricken from the record.

2.   APRIL 14, 2005- UNDERCOVER BUY OF EXHIBIT # 500.

This "undercover buy" is once again a "CI" buy, not a "hand to hand" to a narcotics agent.   The scene for this alleged buy speaks for itself as it in fact occurred in a bar/strip club.   Any patron of a "strip club" will readily note that the lighting is intentionally dim in a "strip club" for various unre-lated reasons.   The seating arrangement described in Trial Transcripts  for November 27, 2006 page 186 to 188 indicate that the "CI" was seated between the suspect Schutz and Officer Chartier.   The officer handed money to the CI who then allegedly gave the money to Schutz who passed narcotics back to the CI to give to the officer.   Because this was not a "hand to hand" narcotics buy, there are an infinite number of possible scenarios in which the officer was duped.   For example:

The suspect could have owed the CI money and was merely playing along while the money went to the CI and stayed there and the drugs could have come from either of the two women. (The CI is in fact a woman- Michelle Bierwagen) Or a fourth party on the other side of the suspect, on an adjacent keno machine, could have provided the drugs and taken the money.   There is nothing in the record to refute the possibility that the CI provided the drugs and kept the funds because the undercover officer did not offer any foundation that he had "sanitized" the buy by having a female officer search the CI prior to the buy and immediately after the buy with himself or other officers keeping her under constant visual surveillance to protect the chain of custody of any narcotics purchased. Once again this "buy"/seizure lacks credibility and must be stricken from testimony.

(10 )

3.   APRIL 22, 2005- UNDERCOVER BUY OF EXHIBIT # 600.

This incident is yet another example of a poorly executed 'undercover buy' that lacks credibility and must be completely disregarded. This is aside from the fact that the drug amount claimed as seized gives rise to some basic accountability issues to be addressed in a later issue.

Trial Transcript for November 27, 2006 pages 190 thru 191 describes a purported "undercover narcotics buy" of 7.4 grams of crack cocaine for $1200.- from Heather Schutz. The scene is described by Officer Chartier as follows:

"I pulled up to Heather's vehicle, and, as usual, my CW or cooperating witness was riding with her, as always the go-between between us." page 190, lines 6,7,8. (Emphasis added by Petitioner)

This scenario contradicts all of the basics of a controlled narcotics buy. For starters the CI/CW has arrived with the suspect and clearly was not in a "sanitized" situation. Did the CW have the drugs when she entered the suspect's vehicle? How could it be confirmed that the CW was not the actual source of the drugs using Schutz as a front? Are the funds going to be retained by the CW or are they actually to be given to the suspect? Since the CW arrived and departed in the suspect's vehicle she could not be searched prior to and immediately after the alleged transaction.  This was not a "controlled narcotics buy" by any definition used by a reputable law enforcement agency.

This "buy" and the alleged evidence obtained is irretrievably tainted and should have been stricken by the Court, thus, it must be stricken now upon a reversal of the instant conviction. Additionally, the "7.4 grams" testified to by Officer Chartier somehow dropped to "6.3 grams" when it reached the DEA Western Lab in San Francisco. This will be addressed in more detail in a later issue addressing the chain of custody of narcotics evidence.

( 11 )

LEGAL ANALYSIS:

The unprofessional and sloppy manner in which Officer Chartier conducted his string of "undercover buys" from Heather Schutz creates a two-pronged issue with an additional concern about drug accountability. First and foremost, the "buys" are invalid at best and create a situation that must be addressed by an evidentiary hearing.

In the greater percentage of law enforcement agencies there are very exacting standards implemented to give undercover buys credibility with the courts. Essentially, the CW must be "sanitized", thoroughly searched for drugs, currency, and weapons prior to being "sent in". The CW is then kept under visual surveillance at all times. Next, when the CW returns they are again subjected to an intense body(and vehicle if permitted to drive)search to ensure that additional drugs were not purchased for personal use or that the funds were actually expended to prevent discrepancies as to prices of drugs, drugs being given for credit and the CW pocketing the "buy funds" and any number of other technical aspects to a valid "undercover narcotics buy by an informant". Officer Chartier followed none of these procedures and it is not apparent from the record if this is due to a lack of training or professional incompetence. All of this testimony must be stricken from the record and disregarded; this would of course require an evidentiary hearing to fully flesh out the record.

Secondly, if the Court should determine that the gross errors or failures of Officer Chartier should have been addressed by defense counsel,then it is a foregone conclusion that defense counsel SANDS was grossly ineffective in his cross-examination of Chartier. This level of ineffectiveness can only be described as prejudicial as it permitted invalid narcotics buys and drugs into the case record before the jury. An evidentiary hearing is required to make a

( 12 )

full and complete inquiry into the cross-examination of Officer Chartier that
should have been conducted. Did Chartier follow the standard procedures, but
counsel SANDS did not think to inquire on voir dire of Chartier? Did Chartier
lack any formal training for his "undercover role" and SANDS did not think to
subpoena his personnel and training files? The record is not complete on these
issues and can only be remedied by an evidentiary hearing with Chartier and
counsel SANDS under oath. Petitioner will move the Court for an evidentiary
hearing in his closing argument.

V.      ISSUE THREE:

        THE LACK OF A VALID AND AUTHENTICATED "CHAIN OF EVIDENCE" FOR THE
        ALLEGED DRUGS SEIZED RENDERS THE EVIDENCE USELESS AS PROVEN BY
        THE DISCREPANCY IN DRUG AMOUNT OF GOVERNMENT EXHIBIT # 600.

The critical item glaringly missing from the record of this case is a
clear and authenticated "chain of evidence" for the narcotics seizures. The
obvious problems with moving the items from the custody of Billings Police
Department to the Federal Bureau of Investigation Field Office to the Drug
Enforcement Administration Western Lab in San Fransciso creates a less than
solid foundation for the evidence being admitted in a criminal case. The best
and most obvious example is the sloppily conducted "undercover buy" of April 22,
in 2005 by Officer Chartier.

The testimony of Chartier, Trial Transcripts Nov. 27, 2006 page 191, lines
three to fourteen give the first hints that something is wrong with this "buy".

"Q.    And how much were you actually attempting to buy that day?"

A.    I don't remember what the--what we arranged on the phone, because the
way we arranged it was that I had $1200 available and that's how much I'd
like to purchase, what I could get."

( 13 )

This entire testimony by Officer Chartier should have set off "bells and whistles" in the ears of defense counsel for sure and the government counsel as well; nothing about this "scenario" is credible and it reeks of deception.

The Honorable Court hearing this claim is an experienced federal jurist who has quite probably heard hundreds of narcotics cases. Drugs are never sold by a "dollar amount". They are always sold by "weight" or "packaging". For example, by the "ounce", by the "gram", by the "kilo"; or , by the "rock" or by the "brick" or other slang terms relating to weight or packaging. To ever ask for drugs by a dollar amount gives the seller the ability to escalate the price per unit of the drug and immediately verifies that the buyer is not an authentic "user" of narcotics. More likely, this scenario is pure fiction.

The evasive response of Officer Chartier combined with the discrepancy in the seized drug weight gives immediate concern as to the authenticity of the buy and the possibility that Officer Chartier was involved in "skimming" drugs from his buys. This is evident in his testimony regarding the drug weight post "buy". Trial Transcript at page 191,lines 12 and 13:

"When we got back, the product weighed 7.4 grams, is what we documented prior to testing."

This is immediately proven as false and completely inaccurate in the later testimony of DEA Chemist KRISTA A. BERNADT. (Trial Transcript: Nov. 29, 2006 page 552 lines 15-20)

"Q. And what did you determine was in 600?

A. This one also contained cocaine base, and it weighed 6.3 grams."

This type of discrepancy was never addressed and fully dissected for the truth of the matter. A seizure of "7.4" grams does not diminish by a full gram to "6.3" grams prior to its arrival at the DEA Lab without some serious mis-handling of evidence or simple misconduct. There is the possibility of a "field

test" being conducted post buy, but this would only require some minute "shaving" from the cocaine 'rocks', not 1.1 grams, a full one-seventh of the seizure.  If a "presumptive" or "field test" was conducted it would be noted in the agents initial report.

     1. NO PROPERTY "CHAIN-OF-EVIDENCE" DOCUMENTS WERE DISCLOSED.

    Along with other discrepancies in this prosecution, the defense was not provided with the evidence handling forms needed to fully document a verifiable chain-of-evidence to permit a valid acceptance of any drug evidence in this case. The only mention of evidence handling documents is found when the DEA Chemist's mention the "DEA Form 7's". Trial Transcript Nov. 29, 2006 page 538,lines 10-12.

    Drug evidence has historically been subjected to mishandling and verifiable misconduct.  The most recent scandal in the San Francisco area concerning a female chemist diverting drugs for personal use is only the most recent of many such documented incidents in law enforcement labs.  For this very reason it is critical that the government **prove** that its' chain-of-custody is rock solid.  The lack of disclosure of any type of evidence handling documentation and the clear discrepancy in the chain-of-evidence/drug amount  by Officer Chartier under oath gives rise to a concern about the authenticity of any  drug evidence admitted in this prosecution.  An evidentiary hearing is the only viable method to address this issue and to learn the truth of the matter.  The interest of justice requires a full evidentiary hearing.

LEGAL ANALYSIS:

    Chain-of-custody records are always requested by prosecutors for any evidence intended for trial use and admission.  Failure to obtain these documents can best be described as "willful blindness" which creates an inference of knowledge of misconduct by the investigating officers.  No longer can prosecutors utilize

the inherent integrity and "imprimatur of the Goverment" <u>United States v Young</u>,
citing at 470 US 1, 18-19 (1985) from <u>Berger v United States</u> 295 US 78,88(1935)
to disguise the lack of a chain-of -custody under a pretense of facilitating an
expeditious trial proceeding for the Court.  Prosecutors are held to very high
standard.  "In representing the United States, a federal prosecutor has a
**special duty not to impede the truth"** <u>United States v Reyes</u> 2009 DJDAR 12250,
at 12253 (9th Cir August 18, 2009).  By failing to disclose the chain-of-custody
documents in discovery the government has actively 'impeded the truth'.

The discrepancies in the actual weight of drug evidence admitted in this
case along with the discovery violation in regards to failure to disclose the
chain-of-custody documents for every piece of evidence presented at trial reeks
of misconduct which clearly requires an evidentiary hearing to resolve.


VI.     ISSUE FOUR:

        INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

When the Court reviews the issues presented under the instant motion it
will be readily apparent that the question of "ineffective assistance of counsel"
is an 'either/or' situation.  <u>Either</u> defense counsel was severely limited and
interfered with in his attempts to provide adequate counsel <u>or</u> he was grossly
incompetent.  There are no other reasonable conclusions.

Petitioner has previously described how he was placed over 300 miles from
his defense counsel.  It has also been explained how the government sought to
place the discovery release under some very severe and unfounded conditions in
order to deny the Petitioner any meaningful opportunity to review and digest the
voluminous information in order to "assist in his own defense".  If the Peti-
tioner's claims are correct then counsel was severely handicapped by these

( 16 )

abusive "win at all costs" tactics of government counsel.  Should the Court
determine that the claims are not persuasive, then it must be presumed that
defense counsel, Jack E. Sands, was "ineffective" and that the Petitioner has
been prejudiced by those failures.

1.    Trial Preparation:  The inability of the Petitioner to review the
voluminous 3000 plus pages of discovery has been clearly described.  If the
Court does not decide  that the government's restrictions were abusive, then
the burden falls upon defense counsel to get the job done.  It is not revealed
in the case/court record if Mr. Sands had ever retained an investigator to work
on the instant case.  If one did exist he could be responsible for transporting
the discovery materials to and from "Wolf's Point".  Counsel was a "retained"
attorney and could have reasonably obtained funding for an investigator. The
question remains to be answered as to why he did not utilize an investigator in
any capacity in this case.

The lack of an investigator is most apparent in the cross-examination of
the governments "cooperating witnesses".  None of the "witnesses" were subjected
to any form of intensive examination on their own criminal pasts or their own
criminal activities other than related to the Petitioner or Heather Schutz.  It
would relatively easy to obtain facts proving welfare fraud, tax evasion, pros-
titution and numerous other criminal acts from this particular set of "witnesses".

Failure to fully investigate the case and particularly the backgrounds and
activities of the government's witnesses is by definition "ineffective".

This has been eloquently described by the Ninth Circuit Court in the case
of Duncan v Ornoski 528 F 3d 1222,1234 (2008) as follows: "This court has repeat-
edly held that a lawyer who fails to adequately investigate and introduce (evidence)
that demonstrates[s] his client's factual innocence, or raise[s] sufficient doubt
as to that question to undermine confidence in the verdict, renders deficient
performance." (internal quotations and citations omitted)

( 17 )

This has also been an area fully addressed by the American Bar Association(ABA) in it's "Standard for Criminal Justice: Prosecution Function and Defense Function. 4-4.1 (3rd Edition 1993)." "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case."

An evidentary hearing must be conducted to permit the record to be completed in regards to any investigation conducted by Mr. Sands, if any did in fact occur. This would of course require Mr. Sands to appear under oath.

2. <u>Failure to Advise Client of All Trial and Plea Options</u>:

The decision whether to plead guilty or go to trial is the defendants. In making it, he is entitled to the effective assistance of counsel. <u>Hill v. Lockhart</u>, 474 U.S. 52,57,106 S. CT. 366,88 L. ED. 2d 203 (1985); <u>Powell v. Alabama</u>,287 U.S. 45,57,53 S. CT. 55,77 L. Ed. 158 (1932)(stating that the period from arraignment until the begining of ...trial" is "perhaps the most critical period of the proceedings."); <u>United States v. Blaylock</u>, 20 F.3d 1458,1468 (9th Cir. 1994). According to the Ninth Circuit Court this is"... a vitally important decision and a critical state at which the right to effective assistance of counsel attaches." <u>Turner v. Calderon</u>, 281 F.3d 851,879 (2002).

The Petitioner was never informed by his attorney of the possible enhancements he faced at sentencing if he were to lose at trial. Counsel continuously told Petitioner that his maximum sentence he could receive was twenty years. Failing to predict a sentence correctly is nto the same as failing to understand the mechanics of the sentencing." "Familiarity with the structure and basic content of the U.S. sentencing guidelines has become a necessity for counsel who seek to give effective representation." "Caselaw distinguishes ordinary errors in applying the guidelines from

(18)

complete unfamaliarity with their basic structure and mechanics and
conclude that the latter may amount to ineffective assistance of counsel."
United States v. Washington,619 F.3d 1252 (10th Cir. 2010). Counsel main-
tained his stance even at the presentence conference with two probation
officers present. Not once was Petitioner ever told that he faced a
possible life sentence'(as it was recomended in the PSR), or the fact that
he could possibly receive the 35 year sentence that was imposed (fifteen
years more than the maximum his attorney stated).

Petitioner was never advised about his option to plead guilty with-
out cooperating with the Government. In doing this Petitioner would have
received a three-level downward adjustment for acceptance of responsibility.
United States v. Booth, 432F.3d 542 (3rd Cir. 2005). The difference in
sentence length is huge and this deficient act alone has severely prejudiced
the Petitioner. The time difference with a three level reduction is approx-
imately three years of the Petitioner's life behind bars without consider-
ing any other reductions that can be sought under 18 U.S.C § 3553(a). This
exact situation has been addressed by the Ninth Circuit Court in United
States v. Salazar-lopez 2007 U.S. App. LEXIS as 25225 concerning a District
of Montana case and is binding precedent.

LEGAL ANALYSIS:

The controlling case for ineffective assistance of counsel
claims is stated in Strickland v. Washington, 466 US 668, 104 S.Ct. 2052,
80 L.ED. 2d 674 (1984). This standard consists of a two-pronged test. First,
defense counsel's performance must be shown to be deficient such as that
he was not acting as "counsel" guranteed by the Sixth Amendment of the
Constitution. Second, the defendant must be able to show that he was act-
ually prejudiced by this poor performance. Petitioner has a reasoned belief
that he has made such a showing on both tests and that if there is any
doubt at all it can be reminded by a full and complete evidentiary hearing.
(19)

The cases cited from within Circuit and other circuit cases as

Supreme Court precedent give clear direction to the lower courts in re-
gards to the areas presented to meet the two-pronged test of Strickland.
For example, if counsel SANDS did in fact conduct an adequate pretrial
investigation he will be able to prove that on the stand under oath in a hearing
on the matter. In regards to the issus of failure to advise on the possi-
bility of sentence enhancements, a life sentence, a 35 year sentence, a plea
bargainand a substantial sentence reduction without cooperation, the issue
should easily be addressed, as the case cited, Salazar-Lopez, is a case
recently heard in the District of Montana (Helena Branch). Even more recent
is United States v. Jaeger, 2010 U.S. Dist. LEXIS 6024 (Butte Division).
This type of poor performance which prejudices the Petitioner is apparently
quite common in this district by local defense attorneys.

For all situations the path to the truth of the claims is to be found
in an evidentiary hearing. All of the claims are ripe for a hearing as the
record is woefully deficient in regards to both issues, and thus, the Court
cannot possibly render a decision without a hearing as "together, the files
and records in this case cannot conclusively show that the prisioner is
entitled to no relief."

Petitioner states that there is a reasonable possibility that, but for
the errors of counsel, the outcome of this criminal proceeding would have
been different. Hill v. Lockhart 474 US 52, 106 S.Ct. 366, 88 LED 2d 203
(1985).

VII.     ISSUE FIVE:

INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL.

The instant claim stems from three critical deficiencies of appeal
counsel DAVID F. NESS, Federal Defenders of Montana. First, counsel refused
to addressed any trial errors of counsel Jack E. Sands. Second, appeal
counsel had a direct conflict of interest which severely limited him in his
attempts to obtain relief for his client. Third, appeal counsel failed to

(20)

argue the issues set out in <u>Apprendi</u> pertaining to Mandatory Minimums.

1. <u>Failure To Raise Errors Based On Personal Friendship With Counsel</u>.

In preparation for direct appeal Petitioner had several communications with his appointed appellate counsel NESS and infromed him of the trial errors that have been stated in this §2255 motion. NESS informed the Petitioner that he was "personal friends" with defense counsel and that he simply would not raise any errors which might discredit or embarrass his "friend". This is of course an outrageous betrayal of the attorney-client relationship and amounts to a gross failure on the part of the appellate counsel, rendering the direct appeal a sham that must be corrected by the Courts.

The truth of the matter is self-evident as any lay person can realize the errors that were made by trial counsel simply by reading the trial transcripts. No juris doctorate or even a bachelor's degree is needed to realize that trial counsel expended little if any time or energy on representing his client. Surely, an attorney who specialized in criminal appeals would have noticed the identical errors in reviewing the transcripts. Appellate counsel was deficient in his duties and was <u>intentionally deficient</u>.

2. <u>Appellate Counsel's Firm Represented the "Star Informant" At Trial</u>.

It is verifiable in the record of the trial that a conflict existed when appellate counsel was named from the Federal Defenders of Montana. This very firm was the counsel of record for <u>Heather Schutz</u>, the "star" witness and formerlover of the Petitioner. This "witness" testified extensively at the three day trial of the Petitioner and gave the most damaging testimony against the Petitioner. Heather Schutz, represented by Federal Defenders of Montana, is a very real denial of the Sixth Amendment right to "conflict-free counsel" as described by the Supreme Court of the United States in <u>Holloway v. Arkansas</u> 435 Us, 98 S.Ct. 1173, 55 LED 2d 426 (1978). The interest of the Petitioner and those of the witness Schutz are without a doubt adverse to one another. If the Petitioner were to prevail on

on appeal it would place the witness Schutz in a precarious position of being subjected to what would imminently be more intense cross-examination and investigation prior to a second trial. This situation meets the two prongs described in Cuyler v. Sullivan 446 US 335, 100 S.Ct. 1708, and 64 LED 2d 333 (1980); specifically, that (1) counsel actively represented conflicting interests, and (2) the conflict of interest adversely affected his lawyer's performance.

The record speaks for itself in this claim. Federal Defenders of Montana actively represented Heather Schutz in her capacity as a "co-operating codefendant" in the trial against the Petitioner. Schutz was testifying as part of a plea deal that would result in a significantly lower sentence. The possibility of a new trial could very likely destroy that "deal" when Schutz was subjected to a more intense investigation and cross-examination by a new trial attorney. The court appointment of Federal Defenders of Montana was error as it is common practice to never permit attorneys from the same law firm to represent adversarial parties in the same or related criminal proceedings. David F. Ness was well aware that he was acting in "bad faith" when he did not move for replacement counsel from the CJA panel of attorneys and remove himself as appellate counsel. The conflict can now be seen as a likely contributor to counsel's erroneous decision to only raise "sentencing issues" in the direct appeal in order to avoid placing Schutz, her trial testimony, and most importantly, her plea "deal" in jeopardy.

3. Failure to argue Apprendi issues pertaining to Mandatory Minimums.

In appeal counsel's briefing, NESS raised several issues relating to the "advisory guidelines." In his brief he argued.

(i) The Government failed to allege in the Indictment or prove beyond a reasonable doubt that the cocaine possessed and distributed was crack.

(ii) The district Court erroneously calculated teh guidelines attendant to the case. He also argued the leadership enhancements.

(22)

Counsel noticed also argued against any sentencing enhancements relating to Petitioner's "mandatory minimum" sentences.

In the Governments reply brief. The government conceded that the enhancements, not charged in the indictment, or proven to the jury, were erroneous. But argued at the same time that they were harmless error. Both parties misapplied the law.

In the first instinct Counsel, NESS, argued the enhancements under an un-preserved Apprendi challenge. Sentencing in this case was held on March 21,2007. Prior to that, on January 22,2007, the Supreme Court ruled on Cunningham v. California,549 U.S. 270 127 S.Ct. 856. During sentencing arguments, Jack Sands made reference to the inapporpriateness of such enhancements under Cunningham. Cunningham is another link in the Apprendi chain. The Court refused to rule on the Cunningham issue and precluded defense Counsel from making any more objections by threatening to give his client another two point enhancement. "The Framers envisioned the Sixth Amendment as a protection for defendants from the power of the Government." quoting Chief justice Roberts dissent in Alleyne v. United states, (2013).Clearly a Judge should not be able to enhance a defendants sentence on the fact that he's having a bad day or he simply doesn't care for the defendants counsel. Quoting Justice Sotomayor's concurrence in ALLEYNE; "we have applied Apprendi to strike down mandatory sentencing systems at the state and federal levels. See Cunningham v. California, (2007)....WE recognize that Apprendi's reasoning extends to criminal fines. See Southern Union Co. v. United States, 132 S.Ct. 2344; 183 L.Ed. 2d 318; (2012). Had Sands been afforded the opportunity to fully present his argument, Ness would have had a more clear picture as to what to present to the Ninth Circuit Court of Appeals. Also by raising the Cunningham issues, The Apprendi arguments were ripe for briefing on appeal. There, Ness, should have also argued against the enhancement of his clients

(23)

mandatory minimum under Apprendi just as the court went in
ALLEYNE. In this case the Government even conceded such error in their
reply brief.

In United States v. O'brien, 560 US, 130 S.Ct., 176 L. Ed. 2d 979,
(2010). The Court looked to the factors set out in Castillo v. United, 530
U.S. 120, 120 S. Ct. 2090, 147 L. Ed. 2d 94 mainly the fourth factor, the
severity of the sentence. In Castillo, the Court looked at the vaulting of
a jury verdict from 5 to 30 years. In O'brien, from 7 to 30 years. The Court
stated "it is a drastic, sixfold increase that strongly suggests a seperate
substantive crime." Petitioner went from 0 to 30 years without even stopping
at his then statutory maximum of 20 years.

The Government argues that these errors were harmless because the judge
simply could have stacked the sentences. That fact if beside the point.
Alleyne the essential sixth amendment inquiry is whether a fact is an
element of the crime... There is no principle or logic to distinguish facts
that raise the maximum from those that increase the minimum.

Ness clearly rendered total ineffective assistance of counsel on direct
appeal by not raising these issues on direct appeal. Regardless of whether
O'brien and Alleyne was available. Due to the fact that Apprendi had already
been set in stone. All that was required was a proper interpretation by a
knowledgeable counsel. Something that Ness lacked.

LEGAL ANALYSIS:

The identical standards for ineffective assistance of counsel at trial
apply to ineffective assistance on appeal. The issues are however much more
easily reviewed in regards to the instant appeal. Counsel cannot deny the
"conflict of interest" claim as it is irrefutable and failure to take the
proper corrective actions is clearly "ineffective." The prejudice prong is
also readily apparent and easily proven. The complete absence of any trial
errors in the direct appeal(s) despite critical mistakes that are recognized
by any layman, has prejudiced the Petitioner by denying him his "due process"
rights to a deirct appeal with "conflict-free counsel".

Ness clearly rendered total ineffective assistance of counsel on direct appeal.

This is exactly the type of situation that requires and evidentary hearing as provided for in Ninth Circuit precedents of <u>United States v Burris</u> 872 F 2d at 915, 917 (1989) and <u>United States v. McMullen</u> 98 F 3d 1155,1159 (1996). The Petitioner has been denied his Sixth Amendment right to 'conflict-free counsel' and at the very minimum he must be given a new "direct appeal" to permit him to raise teh issues <u>intentionally omitted</u> by counsel NESS.

VIII.    <u>ISSUE SIX:</u>

ENACTMENT OF TITLE 21 USC § 841 and §846 VIOLATES THE TENTH
AMENDMENT OF THE CONSTITUTION; THUS THE INSTANT CONVICTION IS
UNLAWFUL REQUIRING REVERSAL AND REMAND TO THE SOVEREIGN STATE OF
MONTANA FOR PROSECUTION.

The instant conviction is based on federal law which was passed in direct conflict and violation of the Tenth Amendment of the United States Constitution. The State of Montana is a sovereign state with the power to enact and enforce the laws approved by the citizens of the State. The State of Montana has in fact enacted laws prohibiting illegal narcotics, such as cocaine and cocaine-base. The State of Montana has law enforcement agencies and judicial officers/courts to address violations of narcotics laws within the confines of the State. There is no valid cause for the federal government to impose it's own version of those very same laws upon the citizens of the State of Montana. To do so violates the Tenth Amendment of the Constitution and the prohibition against the federal government exercising powers not <u>specifically</u> delegated by the states.

The Petitioner was arrested for alleged drug/narcotics violations within the State of Montana. The officers involved in the 'undercover buys' were in fact "local police officers" who received their certifications law enforcement officers via State certifications. There is no  compelling reason that the alleged offenses were not adjudicated in a State court

The instant conviction must be reversed and the case remanded to the State of Montana for a decision on prosecution.

## LEGAL ANALYSIS:

First and foremost the Petitioner has "standing" to raise this claim based upon the decision in Carol Anne Bond v. United States 564 US-, 131 S Ct-, 180 L Ed 2d 269,(2011). The Petitioner's loss of a "liberty interest", his incarceration, permits him to attack the legality of the statue used to arrest, try and convict him.

Next, the constitutional issue of the Tenth Amendment violation is clear as the Amendment as written describes that the federalgovernment shall not enforce powers not specifically delegated by the states, described as "enumerated powers". To enact such laws is unlawful and an "unjustifiable expansion of federal law into [the] state regulated domain." Passing such a law is "beyond the powers of Congress... [and] is not law at all." This enforcement of Title 21 § 846 is a "structural error" requiring reversal of the instant conviction.Structural error is described in United States v. Gonzalez-Lopez, 126 S. Ct. 1557, 2564 (2007) under three circumstances: (1) If its consequences are necessarily difficult to assess, (2) if it necessarily renders the criminal proceeding unfair, or (3) if the harmless-error inquiry is irrelevant to remedying the constitutional error. Any of these three is sufficient, not all three must be present to meet the criteria for structural error. The instant case meets (1) and (2) above almost certainly and possibly (3) as well when it is understood that pre-senting a defendant for trial before a court that does not have legal authority has severely prejudiced that indiviual beyond repair if the matter is taken to a seperate jurisdiction following a reversed conviction. The damage done by the unlawful conviction and incarceration can never act-ually be corrected post-event.

(26)

"federalization" of criminal law in several venues. For example, the
Judicial Conference of the United States (Long Range Plan For the Federal
Courts)(1995), reprinted in 166 FRD 49,83 (1995). The conference cited the
five narrow areas in which crimes should be prosecuted by the federal
government:

    1. Offense against the federal government or its inherent organizations;

    2. Criminal activity with substantial multi-state or international
aspects;

    3. criminal activity involving complex commercial or institutional
enterprises most effectively prosecuted using federal resources or expertise;

    4. Serious high-level or widespread state or local government corruption

    5. Criminal cases raising highly sensitive local issues viewed as more

       objectively prosecuted in the federal system.

ID at 84-85

    Nothing in the instant case reaches the level of any of the five areas
addressed by the Judicial Conference. The alleged crimes involve "gram"
or "ounce" quantities, transported by unsophisticated methods. This pro-
secution could have and should have been left to local authorities as des-
cribed in United States v. Emmons 410 US 396, 411-12 (1973) "...Congress
criminalizes conduct already denounced as criminal by the states, it
affects a change in the sensitive relationship between federal and state
jurisdiction."

    To briefly state his point and preserve issue for later judicial
rulings, Petitioner states that the violation of his "liberty interest" has
created a "concrete adverseness" permitting him to seek relief from the
Tenth Amendment. Lujan v. Defenders of Wildlife 504 US 535,560 (1992).
This case is clearly an alleged violation of conduct addressed by Montana's
own criminal statues; and the duplicative federal laws of 21 USC §846 and
§841 are violations upon the state sovereignty protected by the Tenth
Amendment. "Impermissible Interference with state sovereignty is not within

the enumerated powers of the national government." New York v. United States 505 US 144, 155-59.

IX. ISSUE SEVEN:

THE GOVERNMENT VIOLATED THE DUE-PROCESS PROVISIONS OF THE FIFTH AND FOURTEENTH AMENDMENTS BY ALLOWING THE JURY TO SEE DEFENDANT/PETITIONER IN JAIL CLOTHES WHILE SHACKLED AND HANDCUFFED.

During the course of the jury trial Petitioner was escorted from the yellowstone county detention facility to the federal courthouse in Billings, Montana, by the U.S. Marshals, in jail clothes as well as handcuffs and shackles. Before trial Petitioner would be dressed out in civilian clothes in the holding in the federal courthouse. At the end of the day Petitioner would be placed back into jail clothes and handcuffed and ahcakled in preparation for transport back to the county jail.

On one particular night while being taken to the elevator by two U.S. Marshals, Petitioner caught eye contact with one of the female jurors in the hallway. James Seykora, the AUSA assigned to the case, abruptly pushed Petitioner back into the hallway in an attempt to block the rest of the jury from seeing him in his jail clothes and shackles. The jurors entered the elevator and proceeded. Afterwards the defendant/Petitioner was escorted to an elevator, to the garage and transported back to Y.C.D.F.

In this case, Petitioner was in the hallway, in plain view of the jury, in jail clothes handcuffed and shackled, being escorted by two armed U.S. Marshals. During this entire event, AUSA Seykora, not only witnessed but participated in it by using physical force in an attempt to shield the jury from seeing Petitioner in such a physical state, all which of course was too late. With legal experience dating back to the 1970's AUSA know he had an obligation to notify defense counsel and the courts of the potential constitutional violation so that the matter could be further looked into. But as has bocome common practice by frderal prosecutors even when dealing with Senators such as the late TEd STevens of Alaska. He chose to withhold the evidence to better his position in securing a conviction.

Defendant who is shackled in trial in violation of his constitutional and in view of the jury is inherently prejudiced, and thus entitled to habeas corpus relief. RHODEN V. ROWLAND, 154 F 3d 1034 (9th Cir. 1998). Defendants Sixth Amendment rights are biolated even if only one juror was unduly biased or improperly influenced. U.S. V. SARKISIAN, 197 f 3d 966 (9th Cir. 1999). Prosecutors obligation under BRADY to disclose exculpatory evidence extends  to impeachment evidence and to evidence that was not requested by the defense. PARADIS V. ARAVE, 240 f 3d 1169 (9th Cir. 2001). Even and inadvertent failure to disclose information may constitute a brady violation. BAILEY V. RAE, 339 f 3d 1107 (9th Cir. 2003). As settled, in order for a crady biolation to have occured the evidence at issue "must have been supressed by the state." strickler, 527 U.S. at 281, see also EDWARDS V. AYERS, 542 f 3d759, 768 (9th cir. 2008)("suppression by the prosecution, whether willful or inadvertent, of the evidence favorable to the accused and material to either guilt or punishment biolated the consti-tution."). The term "suppression" does not describe merely overt or purpose-ful acts on the part of the prosecutor; sins of omission are equally with-in brady scope. See Benn v. Lambert, 283 f 3d 1040, 1052 (9th Cir. 2002). ("[T]he terms 'suppression' 'withholding', and 'failure to disclose' have the same meaning for brady purposes.") We perform this step of the inquiry "irrespective [566 f. 3d 908] of the good faith or bad faith of the prosecution" in failing to disclose favorable evidence. Brady 373 U.S. at 87. even an  "innocent" failure to disclose favorable evidence constitutes a brady violation nonetheless. U.S. PRICE, 566 f. 3d 900 (9th Cir. 2009).

X. ISSUE EIGHT:
    INEFFECTIVE ASSISTANCE OF COUNSEL AT PLEADING DUT TO A CONFLICT OF INTEREST.

David Merchant, a federal Defender of Montana, counseled defendant/ petitioner, advised him to plead not guilty and told him that he would have him out of jail in three day (that was seven years ago). At: the same time, David merchant was also

representing Heather Schutz, the Governments star witness, who
was planning to testify against petitioner through the advice of
her then counsel counsel Federal Defender David Merchant. At
petitioners pleading David Merchant put the courts on notice that
he would not be able to represent the petitioner due to a direct
conflict of interest. The court proceeded accepted the not guilty
plea, and remanded petitioner into custody.

David Merchant having first hand knowledge of the case,
simply said, "hi, i'm Dave Merchant just go in and plead not guilty
you know  they're gonna lock you up right?" Petitioner asked why
and Merchants response was "trust me they're gonna lock you up.
I'll have you out in three days." Merchant never explained about
the fact that Schutz qas due to testify against petitioner, as
well as many other alleged co-conspirators. He never told petitioner
that by going to trial he would face numerous enhancements such as
drug type, weight, and leadership. Nor did he advise petitioner
of the applicable statutory maximum he faced. Throughout the
whole trial petitioner was told that his statutory maximum was
twenty years.

Clearly David Merchant labored under a conflict of interest.
Initially, he represented Heather Schutz, and studied the case
through and through. Counsel knew of Schutz active cooperation
with the federal authorities prior to her pleading guilty. Merchant
was with schutz at two of her three debriefings with authorities
when on one occasion for the second time she informed the Govern-
ment that petitioner was not involved in her drug dealing. David
Merchant advised Schutz all the way up to her date of pleading and
after that the only way to obtain a less severe punishment than
she was facing was to cooperate with the Government and testify

(30)

against petitioner. Merchant even went as far as telling Schutz that she was going to recieve a 25 year sentence for the firearms regardless of how many were charged in the indictment. In sum David Merchant carried a division of loyalties due to a severe direct conflict of interest in which he chose to stand loyal to his intial client by advising petititoner to plead not guilty.

LEGAL ANALYSIS:

During plea negotiations defendants are "entitled to the effective assistance of counsel. MISSOURI V. FRYE, 132 S. CT 1399, 182 L. ED 2d 379 (2012) The decision whether to plead guilty or go to trial is the defendants. In making it , he is entitled to the effective assistance of counsel. Hill v. Lockhart, 474 U.S. 52,57, 106 S. CT. 366, 88 L.ED 203 (1985); Powell V. Alabama, 287 U.S 45, 57, 53 S. CT. 55, 77 1. ed. 158 (1932)(stating that the period from "arraignment until the begining of...trial" is "perhaps the most critical period of the proceedings."); United States V. Blaylock, 20 f 3d 1458, 1468 (9th Cir. 1994).

Because the decision is the defendants, counsels obligation to assist is not fulfilled merely by telling the defendant whether he should plead guilty or go to trial. "[A]n accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings, and laws involved and then offer his informed opinion as to what plea should be entered. Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S. CT. 316 92 L. ED 309 (1948).

Representation of codefendants by any one conflicting attorney requires automatic reversal. Critical stages include arraignments, postindictment interrogations, postindictment lineups, and the entry of guilty pleas. HOLLOWAY V. ARKANSAS, 435 US 475, 98 S. CT. 1173, 55 L ED 2d 426 (1978). U.S. V.CRONIC, 466 U.S. 648, 80 L ED

2d 657, 10Case 1:06-cr-00079-DLC Document 166 Filed 07/15/13 Page 32 of 39 prejudice
the accused that the cost of litigating their effect in a particular
case is unjustified." ID at 658. In these cases limited circumstances
prejudice is presumed "withoit inquiry into counsels trial performance
at trial." ID at 662. Thus for example, when trial counsel "labors under
an actual conflict of interest," ID  at 662 n. 31 the courts have presumed
that the entire adversarial right to counsel has been violated ID at 668.
Lambert v. Blodgett, 248 f supp 2d, 988, U.S. DIST. CT. ED. WASHINGTON
(9th Cir. 2003). Quoting Burden v. Zant, 24 f 3d 1298, 1305 (11th Cir.
1994); Ruffin v. Kemp, 767 f 2d 748, 752 (11th Cir. 1985), When an
attorney representing two codefendants negotiates an agreement for one
that requires testimony against the other, an actual conflict did exist
that adversely affected representation.

There has clearly been a serious showing of total ineffective
assistance of counsel at an exremely critical stage. Even more compelling
is the continous conflict of interest that caused the Petitioner serious
injury that in no way can be over looked or ruled to be a simple harmless
error. Supreme Court and Ninth Circuit precedent has constantly ruled
that this error must be corrected in a way that is just and fair.

(32)

On January 27,2010, Petitioner was resentenced to 353 months of imprisionment. 293 months for counts 1-3, 240 months for count 7, to run concurrently; and 60 months on count 8 to run consecutive to counts 1,2,3 and 7. Counsel for Petitioner, Vernon E. Woodward, made several arguments relating to the available sentences at the time. All were denied.

On appeal, Woodward, never raised any issues regarding apprendi as it relates to mandatory minimums. Even though the Court of Appeals affirmed most of the enhancements, it also"vacated"the sentence and remanded the case to District Court for resentencing. In doing that, the Appellate Court gave the Petitioner the option to re-address the sentencing issues. Those issues were never addressed. The failure to address these issues shows a clear demonstration of ineffective assistance of counsel.

LEGAL ANALYSIS:

Based on the Supreme Courts ruling in PEPPER V. UNITED STATES,562 US 131 S. Ct., 179 L. Ed. 196 (2011). When a defendants sentence has been set aside on appeal a district court at resentencing may consider evidence of the defendant's postsentencing rehabilitation, and such evidence may, in appropriate cases, support a downward variance from the now- advisory guidelines range. These issues were not taken into any type of consideration. Along with any other issues that should have been raised. ALLEYNE V. UNITED STATES, US_____(2013) The Sixth Amendment right to have a jury determine the elements of a criminal offense beyond a reasonable doubt is violated when a judge finds a fact that increases a statutory mandatory minimum sentence by a preponderance of the evidence. This error clearly occured for a second time.

The continous constitutional errors in the case are in plain sight and are extremely overwhelming. They continue to hinder the Petitioner in his passionate endeavor for post conviction relief.

(33)

require, at the very least an  evidentary hearing to resolve these issues
on record.

XII. <u>ISSUE TEN:</u>
>        INEFFECTIVE ASSISTANCE OF COUNSEL AS TO THE FAIR SENTENCING ACT.

Petitioner filed a Pro Se 3582(c)(2) motion under the Fair Sentencing
Act. The Court appointed Michael Donahoe to assist Petitioner with his
motion. In Petitioners intial motion he asked the court to  reduce his
sentence to the newly amended guidelines. Counsel Donahoe requested the
same. Petitioner made numerous unsucessful attempts to contact Donahoe.
On Feburary 13,2012, Petitioner contacted counsels office to check on the
status of his case since he had not received anything from him. He notified
counsels secretary that the time for the government  to respond had passed.
She stated that she would look into it. Some time later, Petitioner
received a letter from Counsel dated Feburary 14, 2012 stating that his
sentence had been reduced to 295 months. Petitioner's intial motion
requested 180 months (120 months for the drugs and 60 months for the gun).
Petitioner appealed the judgement Pro Se, due to the fact that at the time
counsel was unwilling to do so. The court ultimately  appointed counsel to
appeal the decision. Counsel had a conference call with Petitioner attempt-
ing to urge him no to appeal the nearly 25 year sentence. Petitioner never
asked defense counsel to represent him as it was clear that he was un-
willing to do just that. In his brief counsel argued <u>Pepper v. United States</u>,
_____ U.S._____, 131 S. Ct. 1229 (2011), <u>United STates v. Howard</u>,
644 f. 3d 455 (6th Cir. 2010). After an attempt to have counsel substi-
tuted was denied, the judgement of the district court was affirmed.

The Anti-Drug Abuse Act of 1986, enacted tough sentencing policies
directed at African Americans. Assuming we are all familiar with the
legislative histroy of the crack-to-powder sentencing ratio, let us fast
forward to the current case at hand. This case allegedly involves a large

ment or proven to the jury. On a first offense the Petitioner was Sentenced
to 35 years imprisionment. Steven Berg, a 42 year old white male, who is
referenced in Petitioner's PSR 36 times, also an alleged co-conspirator
pled güilty to an indictment involving over 12 pounds of crack, was
believed to had assaulted a man with a firearm over a drug debt, sexually
assaulted a female Government informant, was observed at a public park mid-
day, havïng sex with a child, engaged in a high speed chase with federal
agents, who were in the process of serving a search warrant at his resid-
ence, and ultimately apprehended him- but not before he tossed some nar-
cotics out  the window- with a loaded gun and a machete under the driver
seat. received not one day in jail for his involvement in the conspiracy.
Judge Richard Cebull- who has now stepped down as a Judge due to inappro-
priate racial comments he made about President Obama- sentenced Berg to 5
years on the firearm count stating that race played not factor in sentencing
him.

It has been proven time and time again that since it's enactment the
crack-to-powder ratio has been applied 100 times more harshly to African
Americans. Here there is no difference that that trend continues. This is
clearly a violation of the Equal Protection Clause.

## LEGAL ANALYSIS:

The Fifth Amendment forbids federal recial discrimination in the same
way as the fourteenth Amendment forbids state racial discrimination.
Boling v. Sharpe,347 U.S. 497, 74 S. Ct. 693, L. Ed. 884 (1954); United
States v. Blewett U.S. App. LEXIS 9889; (6th Cir. 2013 "If there is a
doubt under the interlocking texts of the statutory and guideline provi-
sions or under the application notes or any amendment to the guidelines,
the rule of lenity should apply. Under that rule ambiguity should be reso-
lved in the pefendants favor. "The preamble to teh Fair Sentencing Act
recognizing racial injustice, states that it is designed 'to restore
fairness to federal cocaine sentencing!"

Senator Patrick Leahy was quoted as saying the crack to powder ratio law is one of the most notorious symbols of racial discrimination in the modern criminal justice system. Here as in this case, Petitioner still remains at the unjust 100-to-1 crack-to-powder ratio after the congressional passing of the Fair Sentencing Act.

The Constitution's guarantee of equality "must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot" justify disparate treatment of that group. Department of Agri- CULTURE V. MORENO, 413 U.S. 528, 534-535 (1973) In determing whether a law is motivated by an improper animus or purpose, "'[d] iscriminations of an unusual character'" especially require careful consideration.

Due to the overwhelming uncontradicted evidence, there can be no doubt that the 100-to-1 crack-to-powder ratio., which was impetuously passed , vehemently punishes black more harshly. The Fair SEntencing Act, when applied to one group of victims and denied (or partially denied) to another, can by no means survive the Equal Protection Clause of the fourteenth Amendment.

Accordingly as in Blewett, the Fair Sentencing Act should "fairly" be applied to all crack offenders. Furthermore as stated in United States v. Evans, 782 F. Supp. 515; (1991) U.S. Dist. LEXIS 19456 "a subsequent amendment to a united states sentencing guideline mey be entitled to substantial weight in construing earlier law when it plainly serves to clarify rather than change existing law" Amendment 750 was enacted as a clarification of the retroactivity pertaining to the Fair Sentencing Act. It doesn't state whether or not if it is partial or whole. In looking for clarification we look to the framers of the U.S. Constitution. Under the Fourteenth Amendment it must be in whole. Meaning it applies to all who have been sentenced under it since it's enactment in 1987.

(36)

XIII  ISSUE ELEVEN

THE GOVERNMENT VIOLATED THE DUE PROCESS PROVISIONS OF THE FIFTH

AND FOURTEENTH AMENDMENT BY WITHHOLDING EVIDENCE.

This issue brings us to the question of whether the Government comitted

presecutorial misconduct,intentionally or unintentionally withheld evidence

favorable to the defense, or just flat out lied and cheated. Petitioner

declares that all of the above can be proven at an evidentary hearing.

As the newspaper stated "Seykora called a parade of witnessess." With

his more tha 30 years experience of arguing cases, AUSA, James E. Seykora,

knew he had an obligation to hand over any Brady material that could have

been used to impeach a witness. Of course he did not. The Petitioner was

informed by numerous attorneys that Seykora was a liar and a cheat and he

would stop at nothing to attain a conviction . This is yet another example

of his corruption. Tyrone Jackson cooperated with the government in this

case. what the government did not do was notify the defense of Jacksons

"prior cooperation" with them in a prior drug case out of this district.

Jackson even received a reduced sentence in that case as he did in this one.

Surely the government had knowledge of this matter. especailly due to the

fact that Jackson was out of prison less than a year before he was rearrested

on new federal drug charges. Ashley Grimm, another government witness, also

had a prior arrest record that the government failed to inform the defense

about. As well as an investigation about a string of robberies that had

been occuring in and around the billings area. Heather Schutz, the Govern-

ment's star witness, also had a prior arrest record that spanned four states

She was also working with Las Vegas Metropolitan Police in 2000. She would

give them guns in exchange they would overlook her illegal prostitution.

One can seriously doubt that a snitch takes breaks in their life to decide

to no longer be and informant. It is more likely that these informants con-

tinued to snitch while even incarcerated for not other purpose than personal

gain. Whether the government had knowledge of these incidents or not (judge-

ing from the frivolous PSR that was prepaired for the defendant it can be

assumed  that they did) they maintained a duty to fully investigate the case

(37)

throughly The Government cannot simply say that they had no knowledge of
these witnessess actions.

<u>LEGAL ANALYSIS</u>:

<u>Brady v. Maryland</u>,373 U.S. 83 S. Ct. 1194, 10 L. Ed 2d 215 (1963)
It is the state's obligation to turn over all information bearing on a
government witness's credibility. This must include the witness's criminal
record, including prison records, and any information therein which bears
on credibility. <u>United States v. Price</u>,566 F. 3d 900 (9th Cir. 2009). In
Carriger v. Stewart, 132 F.3d 463, 479-80 (9th Cir. 1997)(en banc)(cita-
tions omitted)(emphasis added) actual awareness (or lack thereof) of ex-
culpatory evidence in the government's hands,...in not determinative of the
prosecution's disclocure obligations. Rather, the prosecution has a duty to
learn of any exculpatory evidence known to others acting on the governments
behalf. Because the prosecution is in a unique position to obtain informa-
tion known to other agents of the government, it may not be excused from
disclosing what it does not knkow but could have learned. <u>Benn v. Lambert</u>
283 F.3d 1040, 1053 (9th Cir. 2002) ("[T]he'terms''suppression','withhold-
ing', and'failure to disclose' have the same meaning for Brady purposes.").
The government clearly did a less than proffesional job in this case.
From throughly investigating it's witness's past, to failing to turn
over the obvious evidence it had knowledge of. This is the same situation
the Courts are dealing with in Washington D.C. in the case of former
Bureau of Prison intern Chandra Levy. Where the government failed to inform
the defense about the life that the government's witness was living as an
all around snitch reaping the benefeits from any and all who were willing
top reward him. <u>Phillips v. ornoski</u> 673 f.3d 1168 (9th Cir. 2012)(cert
denied) "Napue prohibits the government from knowingly using false evidence
to obtain a criminal conviction, while Alcorta and Pyle obligate the
government to correct false evidence thus presented. The governments
handling of this case is absolutely inacceptable and therefore should be
resolved in favor of the Petititoner.

XIV.      <u>CONCLUSSION</u>:

Petitioner respectfully request and evidentiary hearing to complete the "record" in regards of each of the claims. Petitioner also requests the Court to consider sumulative effect of the multiple claimed errors as well as each claim indivdually. Relief is requested in teh form of a reversal of the instant conviction or a reversal and remand to the State of Montana or a reversal and remand for resentencing. The forgoing is true and correctunder penalty of perjury.

respectfully submitted,

_____ 07/8/2013
LaShawn Jermaine Johnson, Petitioner

(39)